## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVE KLEIN, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| OMEGA HEALTHCARE INVESTORS, INC., C. TAYLOR PICKETT, ROBERT O. STEPHENSON, and DANIEL J. BOOTH, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Steve Klein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Omega Healthcare Investors, Inc. ("Omega" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Omega's securities between

February 8, 2017 and October 31, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Omega is a self-administered real estate investment trust ("REIT") that invests in income producing healthcare facilities, including long-term care facilities located in the United States and the United Kingdom.

3.      On July 26, 2017, after the market closed, Omega issued a press release announcing its second quarter 2017 financial results. On the next day, July 27, 2017, the Company held a conference call to discuss its results. On the call, Chief Operating Officer ("COO") Daniel Booth ("Booth") stated that "we continue to see certain regional operators struggle with various operational pressures" and that two of the Company's top ten private operators had seen margins and coverages decline, which created liquidity concerns.

4.      On this news, the Company's stock price fell $1.35 per share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy trading volume.

5.      On October 30, 2017, after the market closed, Omega issued a press release announcing its third quarter 2017 financial results. On the next day, October 31, 2017, the Company held a conference call to discuss its results. On the call, Booth stated that "[i]n addition to Orianna, we continue to experience specific operator performance issues" including issues with Signature Healthcare, "another top ten operator," due to "liquidity issues [that] are impacting the ability of these operators to pay rent on a timely basis." On the same call, Chief Financial Officer ("CFO") Robert Stephenson ("Stephenson") stated that "[o]perating revenue

for the quarter was approximately $220 million versus $225 million for the third quarter of 2016" and that "[t]he decrease was primarily a result of placing Orianna on a cash basis" which caused the Company to record no Orianna revenue for the quarter. Stephenson also stated that "[w]e have lowered our 2017 adjusted [funds from operations ("FFO")] guidance to $3.27 to $3.28 per share" in part due to "the temporary loss of Orianna revenue for both the third and fourth quarters" and the fact that the Company "placed a non top ten operator," Daybreak, "on a cash basis effective September 1st"

6.      On this news, the Company's stock price fell $2.11 per share, or 6.8%, to close at $28.86 per share on October 31, 2017, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) financial and operating results of certain of the Company's operators were deteriorating; (ii) as a result, certain of the Company's operators were experiencing worsening liquidity issues that were significantly impacting the operators' ability to make timely rent payments; (iii) consequently, certain of the Company's direct financing leases were impaired and certain receivables were uncollectible; and (iv) as a result of the foregoing, Defendants' statements about Omega's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Omega securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Omega Healthcare Investors, Inc. is incorporated in Maryland. Omega's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OHI."

15.     Defendant C. Taylor Pickett ("Pickett") has served at all relevant times as the Chief Executive Officer ("CEO") of Omega.

16.     Defendant Robert O. Stephenson ("Stephenson") has served at all relevant times as the Chief Financial Officer ("CFO") of Omega.

17.     Defendant Daniel J. Booth ("Booth") has served at all relevant times as the Chief Operating Officer ("COO") of Omega.

18.     Defendants Pickett, Stephenson, and Booth (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Omega's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Omega is purportedly a self-administered REIT that invests in income producing healthcare facilities, including long-term care facilities located in the United States and the United Kingdom.

**Materially False and Misleading
Statements Issued During the Class Period**

20.    The Class Period begins on February 8, 2017. On that day, the Company issued a press release entitled "Omega Announces Fourth Quarter 2016 Financial Results; New Investments and Increased Dividend for 18th Consecutive Quarter." Therein, the Company stated, in relevant part:

> *Operating Revenues and Expenses* – Operating revenues for the three-month period ended December 31, 2016 totaled $234.5 million and included $0.7 million of cash proceeds from a legal settlement and $18.3 million of non-cash revenue.
>
> Operating expenses for the three-month period ended December 31, 2016 totaled $87.8 million and were comprised of $70.8 million of depreciation and amortization expense, $7.5 million of general and administrative expense, $5.9 million in provisions for uncollectible mortgages, notes and straight-line receivables and $3.7 million of stock-based compensation expense. The $5.9 million in provisions for uncollectible mortgages, notes and straight-line receivables primarily resulted from the write-down of one operator's notes to fair value. The notes were assumed as part of the Aviv Merger.
>
> . . .
>
> *Funds From Operations* – For the three-month period ended December 31, 2016, FFO was $171.5 million, or $0.84 per common share on 205 million weighted-average common shares outstanding, compared to $127.4 million, or $0.65 per common share on 198 million weighted-average common shares outstanding, for the same period in 2015.
>
> The $171.5 million of FFO for the three-month period ended December 31, 2016 includes the impact of $5.9 million in provisions for uncollectible mortgages, notes and straight-line receivables and $3.7 million of non-cash stock-based compensation expense, offset by a $0.7 million of one-time non-cash revenue.
>
> The $127.4 million of FFO for the three-month period ended December 31, 2015 includes the impact of $20.5 million of interest refinancing expense, $7.6 million in provisions for uncollectible mortgages, notes and straight-line receivables, $4.5 million of non-cash stock-based compensation expense, $2.8 million of interest expense related to the early extinguishment of debt and $2.0 million of acquisition and merger related

costs; offset by $5.4 million "catch-up" of in-place lease revenue recognition resulting from an updated valuation of the assumed leases from the Aviv Merger.

Adjusted FFO was $180.4 million, or $0.88 per common share, for the three months ended December 31, 2016, compared to $159.4 million, or $0.81 per common share, for the same period in 2015. For further information see the "Funds From Operations" schedule.

21.     On February 24, 2017, the Company filed its annual report on Form 10-K for the year ended December 31, 2016. The 10-K reaffirmed the Company's statements about its financial results contained in the press release issued on February 8, 2017.

22.     On May 3, 2017, the Company issued a press release entitled "Omega Announces First Quarter 2017 Financial Results; Increased Dividend Rate for 19th Consecutive Quarter." Therein, the Company stated, in relevant part:

> **Operating Revenues and Expenses** – Operating revenues for the three-month period ended March 31, 2017 totaled $231.7 million which included $18.1 million of non-cash revenue.
>
> Operating expenses for the three-month period ended March 31, 2017 totaled $92.5 million and were comprised of $70.0 million of depreciation and amortization expense, $8.8 million of general and administrative expense, $7.6 million of impairment on real estate properties, $3.7 million of stock-based compensation expense and $2.4 million in provision for uncollectible accounts. The $7.6 million and $2.4 million charges were primarily the result of the Company's continued effort to exit certain non-strategic facilities.
>
> **Other Income and Expense** – Other income and expense for the three-month period ended March 31, 2017 was a net expense of $37.1 million, which was primarily comprised of $45.0 million of interest expense and $2.5 million of amortized deferred financing costs. The expense was offset by a one-time $10.4 million contractual settlement with an unrelated third party related to a 2012 contingent liability obligation that was resolved in the first quarter of 2017.
>
> **Funds From Operations** – For the three-month period ended March 31, 2017, FFO was $181.0 million, or $0.88 per common share on 206 million weighted-average common shares outstanding, compared to $153.6 million, or $0.77 per common share on 198 million weighted-average common shares outstanding, for the same period in 2016.

The $181.0 million of FFO for the three-month period ended March 31, 2017 includes the impact of $3.7 million of non-cash stock-based compensation expense and $2.4 million in provision for uncollectible accounts, offset by a $10.4 million non-cash contractual settlement.

The $153.6 million of FFO for the three-month period ended March 31, 2016 includes the impact of $5.1 million in provision for uncollectible accounts, $3.8 million of acquisition costs, $2.8 million of non-cash stock-based compensation expense and $0.3 million of interest refinancing costs. Adjusted FFO was $176.7 million, or $0.86 per common share, for the three months ended March 31, 2017, compared to $165.4 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

. . .

## 2017 ADJUSTED FFO GUIDANCE AFFIRMED

The Company affirmed its 2017 annual Adjusted FFO available to common stockholders to be between $3.40 and $3.44 per diluted share. The Company's 2017 FAD guidance and reconciliation to projected net income can be found in the Company's First Quarter 2017 Financial Supplement located on the Company's website. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
| | Full Year |
| Net Income | $1.86 - $1.90 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.04 |
| FFO | $3.26 - $3.30 |
| Adjustments: | |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.01 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.40 - $3.44 |

23.     On May 5, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2017. The 10-Q reaffirmed the Company's statements about its financial results contained in the press release issued on May 3, 2017.

24.     The statements referenced in ¶¶ 20-23 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) financial and operating results of certain of the Company's operators were deteriorating; (ii) as a result, certain of the Company's operators were experiencing worsening liquidity issues that were significantly impacting the operators' ability to make timely rent payments; (iii) as a result, certain of the Company's direct financing leases were impaired and certain receivables were uncollectible; and (iv) as a result of

the foregoing, Defendants' statements about Omega's business, operations, and prospects, were

materially false and/or misleading and/or lacked a reasonable basis.

25.    On July 26, 2017, after the market closed, the Company issued a press release

entitled "Omega Announces Second Quarter 2017 Financial Results; Increased Dividend Rate

for 20th Consecutive Quarter." Therein, the Company stated, in relevant part:

> ***Operating Revenues and Expenses*** – Operating revenues for the three-month period ended June 30, 2017 totaled $235.8 million which included $18.0 million of non-cash revenue and $1.9 million of one-time revenue related to two operator's contingent payments that were not earned.
>
> Operating expenses for the three-month period ended June 30, 2017 totaled $94.7 million and consisted of $70.4 million of depreciation and amortization expense, $10.1 million of impairment on real estate properties, $7.8 million of general and administrative expense, $3.7 million of stock-based compensation expense and $2.7 million in provision for uncollectible accounts. The $10.1 million and $2.7 million charges were primarily the result of the Company's continued effort to exit certain non-strategic facilities and/or operators.
>
> ***Other Income and Expense*** – Other income and expense for the three-month period ended June 30, 2017 was a net expense of $72.3 million, primarily consisting of $48.1 million of interest expense, $22.0 million of interest refinancing costs and $2.5 million of amortized deferred financing costs.
>
> ***Funds From Operations*** – For the three-month period ended June 30, 2017, FFO was $150.9 million, or $0.73 per common share on 207 million weighted-average common shares outstanding, compared to $172.3 million, or $0.87 per common share on 199 million weighted-average common shares outstanding, for the same period in 2016.
>
> The $150.9 million of FFO for the three-month period ended June 30, 2017 includes the impact of $23.5 million of one-time interest refinancing costs, $3.7 million of non-cash stock-based compensation expense and $2.7 million in provision for uncollectible accounts, offset by $1.9 million of one-time revenue.
>
> The $172.3 million of FFO for the three-month period ended June 30, 2016 includes the impact of a $5.4 million cash receipt related to early termination of mortgages, $3.7 million of non-cash stock-based

compensation expense, $3.5 million of acquisition costs and a $1.2 million adjustment (recovery) related to the provision for uncollectible accounts.

Adjusted FFO was $179.0 million, or $0.87 per common share, for the three months ended June 30, 2017, compared to $173.0 million, or $0.87 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

. . .

### 2017 ADJUSTED FFO GUIDANCE REVISED

The Company has revised its 2017 annual Adjusted FFO available to common stockholders to be between $3.42 and $3.44 per diluted share. The Company's 2017 FAD guidance and reconciliation to projected net income can be found in the Company's Second Quarter 2017 Financial Supplement located on the Company's website. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

|  | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
|---|---|
|  | Full Year |
| Net Income | $1.82 - $1.84 |
| Depreciation | 1.40 |
| Gain on assets sold | (0.03) |
| Real estate impairment | 0.09 |
| FFO | $3.28 - $3.30 |
| Adjustments: |  |
| Contractual settlement | (0.05) |
| Provision for uncollectible accounts | 0.02 |
| Transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| One-time revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.42 - $3.44 |

26.     On the next day, July 27, 2017, the Company held a conference call to discuss its second quarter results. On the call, Booth stated, in relevant part:

While we're cautiously optimistic that portfolio-wide coverages have stabilized, we continue to see certain regional operators struggle with various operational pressures, including a tightened labor market, length of stay compression and an increase in PL/GL claims. Two our top ten private operators in particular have seen margins and coverages decline and as a result created liquidity concerns.

The first of these private operators, and one which we discussed on our last earnings call, has continued to experience [quarterly pressures], despite finally showing signs of operational improvements. Coverage for the trailing 12-months ended March 31, 2017 remained slightly below 1 times. However, results for the standalone first quarter was 1.12 times and year-to-date results through May remained consistent.

Efforts to manage through these operational pressures have included the following initiatives: replacing the entire executive management team, including a very recent and significant downsizing of both corporate and regional staff; establishing a new disciplined corporate culture which involve replacing a majority of facility-level management; rebranding its corporate identity; revising its mission statement; and implementing new business practices; negotiating numerous vendor contracts; and lastly, establishing a centralized reform network.

Additionally, Omega has helped concentrate this operator's geographic footprint by selling off six of its seven Northwest facilities to third-party operators. One remaining facility in the Northwest is expected to be sold on August 1, pending regulatory approval. Omega has also transitioned this operator's entire Texas region which consisted of nine facilities to another existing Omega tenant.

We are consciously optimistic that the combination of these efforts will result in steadily improving margins and eventually return to its former profitability. However, in the meantime, our past due rent has reached nearly ninety days in arrears. As such, any further deterioration and/or the failure of the tenant to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets.

The second of the aforementioned top ten private operators, while experiencing modest labor [] issues, has had the added challenges of [] an OIG DoJ investigation that has resulted in ongoing settlement discussions, and ongoing restructure discussions with its working capital lender and another sizeable landlord.

While Omega has reached a tentative amicable restructured plan with this tenant, the ultimate successful resolution with these other constituents will possibly be necessary to conclude successful out-of-court settlement. It is

important to note that Omega's specific standalone portfolio, while down from its historical performance, continues to produce coverage levels only slightly below Omega's overall portfolio mean.

In addition, Omega has considerable security deposits and significant personal guarantees to support what we believe are short term liquidity issues. As of today, this operator is currently nearing ninety days past due without the application of a security deposit which, in conjunction with our personal guarantees, more than covers the entire past due balance.

Overall, while the ultimate outcome of these two portfolio issues could potentially cause a continuing but temporary interruption of current rent and prompt further discussions, we remain confident in both current management team's expertise. Furthermore, we're confident that the physical assets themselves and the strong markets within which they are located provide comfort in the long term longevity and future success of these facilities.

27.    On this news, the Company's stock price fell $1.35 per share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy trading volume.

28.    The above statements identified in ¶¶ 25-26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (i) financial and operating results of certain of the Company's operators were deteriorating; (ii) as a result, certain of the Company's operators were experiencing worsening liquidity issues that were significantly impacting the operators' ability to make timely rent payments; (iii) as a result, certain of the Company's direct financing leases were impaired and certain receivables were uncollectible; and (iv) as a result of the foregoing, Defendants' statements about Omega's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

13

**Disclosures at the End of the Class Period**

29.    On October 30, 2017, after the market closed, the Company issued a press release

entitled "Omega Announces Third Quarter 2017 Financial Results; Increased Dividend Rate for

21st Consecutive Quarter." Therein, the Company stated, in relevant part:

**CEO COMMENTS**

Taylor Pickett, Omega's Chief Executive Officer stated, "We are in active
discussions with Orianna regarding the transition of some or all of their
remaining portfolio to new operators. Since 2014, occupancy in the
Orianna portfolio has declined from 92% to 89%. Revenue has grown by
2%, while operating expenses have grown by 6%. We believe that for
some of the Orianna facilities new operators may be able to improve
occupancy and reduce expenses; however, based on current facility
performance, we anticipate that the current annual contractual rent of $46
million will likely be reduced to a range of $32 million to $38 million
once the transition process is complete." Mr. Pickett, continued, "The
transition timing is expected to take approximately six months."

. . .

**THIRD QUARTER 2017 RESULTS**

***Operating Revenues and Expenses*** – Operating revenues for the three-
month period ended September 30, 2017 totaled $219.6 million which
included $13.3 million of non-cash revenue.

Operating expenses for the three-month period ended September 30, 2017
totaled $307.9 million and consisted of $194.7 million in impairment on
direct financing leases related to the Orianna portfolio, $11.9 million in
provision for uncollectible accounts ($9.5 million related to Orianna),
$71.9 million of depreciation and amortization expense, $17.8 million of
impairment on real estate properties, $7.7 million of general and
administrative expense, and $3.9 million of stock-based compensation
expense.

***Other Income and Expense*** – Other income and expense for the three-
month period ended September 30, 2017 was a net expense of $49.5
million, primarily consisting of $47.4 million of interest expense and $2.2
million of amortized deferred financing costs.

***Funds From Operations*** – For the three-month period ended September
30, 2017, FFO was a loss of ($46.8) million, or a loss of ($0.24) per

common share on 207 million weighted-average common shares outstanding, compared to $162.6 million, or $0.80 per common share on 204 million weighted-average common shares outstanding, for the same period in 2016.

The $46.8 million loss of FFO for the three-month period ended September 30, 2017 includes the impact of $194.7 million in impairment on direct financing leases, $11.9 million in provision for uncollectible accounts and $3.9 million of non-cash stock-based compensation expense. The $162.6 million of FFO for the three-month period ended September 30, 2016 includes the impact of $3.7 million of non-cash stock-based compensation expense, $2.3 million of acquisition and merger related costs, $1.8 million of interest refinancing costs and $0.5 million of non-cash revenue.

Adjusted FFO was $163.6 million, or $0.79 per common share, for the three-month period ended September 30, 2017, compared to $169.9 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

## CFO COMMENTS

Bob Stephenson, Omega's Chief Financial Officer commented, "During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve. Since Orianna did not achieve their revised operating plan and pay their full contractual rent, we placed them on a cash basis and therefore our third quarter results, including AFFO and FAD, do not include any revenue related to Orianna." Mr. Stephenson continued, "Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several large provisions related to the direct financing leases during the quarter."

. . .

## 2017 ADJUSTED FFO GUIDANCE REVISED

Bob Stephenson, Omega's CFO commented, "We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna and a non-top ten operator on a cash basis."

The Company's revised guidance for 2017 Adjusted FFO is now $3.27 to $3.28 per diluted share. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

| | 2017 Annual Adjusted FFO Guidance Range (per diluted common share) |
| --- | --- |
| | Full Year |
| Net Income | $0.62 - $0.63 |
| Depreciation | 1.37 |
| Gain on assets sold | (0.04) |
| Real estate impairment | 0.17 |
| FFO | $2.12 - $2.13 |
| Adjustments: | |
| Provision for impairment on direct financing leases | 0.96 |
| Provision for uncollectible accounts | 0.07 |
| Contractual settlement | (0.05) |
| Acquisition/transaction costs | 0.00 |
| Interest – refinancing costs | 0.11 |
| Other revenue | (0.01) |
| Stock-based compensation expense | 0.07 |
| Adjusted FFO | $3.27 - $3.28 |

30.     On the next day, October 31, 2017, the Company held a conference call to discuss its third quarter results. On the call, Pickett, Stephenson, and Booth stated, in relevant part:

**Pickett**

Adjusted FFO for the third quarter is $0.79 per share. Funds available for distribution, FAD, for the quarter is $0.73 per share. The reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting with no adjusted FFO or FAD recognized for Orianna in the third quarter.

. . .

**Stephenson**

Operating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016. The decrease was primarily a result of placing Orianna on a cash basis, and therefore, we recorded no Orianna revenue for the quarter.

. . .

We have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share. The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters; and second, we placed a non-top ten operator on a cash basis effective September 1st, as our outstanding contractual receivable exceeded our revenue recognition test.

. . .

**Booth**

In addition to Orianna, we continue to experience specific operator performance issues as discussed on our last several calls, including Signature Healthcare, another top 10 operator. In both cases, liquidity issues are impacting the ability of these operators to pay rent on a timely basis.

The first operator, Orianna, has fallen significantly behind on rent and as a result has been placed on a cash basis accounting as previously discussed by both Taylor and Bob. While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, the overall portfolio continues to struggle in past due rent headwind.

Our next step, hopefully, is to consensually transition of the remaining portfolio of 42 facilities by virtue of either asset sales or re-leasing to other operators. While we believe the remaining states are considered very attractive within our industry. We expect our contractual rent to decline by a range of between 8 million and 14 million per annum. This will result in a pro forma EBITDAR coverage ratio, assuming all the facilities are re-leased of between 1.2 times and 1.5 times given current performance.

Our second top 10 operator, Signature Healthcare, has also fallen further behind on rent in the third quarter, predominantly as a result of anticipated tightening restrictions upon their borrowing base by their working capital lender thus reducing availability. At this time, it is important to note that the vast majority of Signature's past due rent balance is covered by a letter of credit in excess of $9 million.

Despite the current liquidity situation, we believe we have a path to continue our longstanding relationship with Signature, under a long-term consensual restructure that involves multiple constituents and then keep Signature out of a formal court-involved reorganization. This out of court restructuring may involve the following components of consideration: a certain amount of deferred rent, CapEx funds and working capital line of credit. This scenario would involve the approval of other third-party constituents, including Signature's other significant landlord; Signature's working capital lender, the Department of Justice and certain other third-party claimants. While we cannot predict the ultimate outcome of these third-party constituent discussions, we feel that we have made significant progress and are optimistic that an out of court resolution can be realized.

In addition to the Orianna and Signature ongoing restructure efforts, we have one other non-top 10 operator that has fallen behind on rent and that has required future rent payments to be placed on cash basis accounting. Over the last several months, we have negotiated a settlement and forbearance agreement with this operator, which will result in rent payments in the fourth quarter to be about approximately 23% less than our current contractual rent. Beginning in January, we expect rent to return to the full contractual amount and the past-due rents will begin to be repaid in the latter half of 2018.

31.     On this news, the Company's stock price fell $2.11 per share, or 6.8%, to close at $28.86 per share on October 31, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Omega securities between February 8, 2017, and October 31, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Omega's common stock actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Omega shares were traded publicly during the Class Period on the NYSE. As of October 27, 2017, Omega had 198,073,305 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Omega or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Omega; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

38.     The market for Omega's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Omega's securities relying upon the integrity of the market price of the Company's securities and market information relating to Omega, and have been damaged thereby.

39.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Omega's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Omega's business, operations, and prospects as alleged herein.

40.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Omega's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased Omega's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Omega, their control over,

and/or receipt and/or modification of Omega's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Omega, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

44.    The market for Omega's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Omega's securities traded at artificially inflated prices during the Class Period. On April 21, 2017, the Company's stock price closed at a Class Period high of $34.98 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Omega's securities and market information relating to Omega, and have been damaged thereby.

45.    During the Class Period, the artificial inflation of Omega's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Omega's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Omega and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.    At all relevant times, the market for Omega's securities was an efficient market for the following reasons, among others:

(a)    Omega stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Omega filed periodic public reports with the SEC and/or the NYSE;

(c)    Omega regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Omega was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.    As a result of the foregoing, the market for Omega's securities promptly digested current information regarding Omega from all publicly available sources and reflected such information in Omega's stock price. Under these circumstances, all purchasers of Omega's securities during the Class Period suffered similar injury through their purchase of Omega's securities at artificially inflated prices and a presumption of reliance applies.

48.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material

misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Omega who knew that the statement was false when made.

# FIRST CLAIM
## Violation of Section 10(b) of The Exchange Act and
## Rule 10b-5 Promulgated Thereunder
## Against All Defendants

50.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Omega's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

52.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Omega's financial well-being and prospects, as specified herein.

54.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Omega's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Omega and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.      Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.      Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Omega's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Omega's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Omega's securities during the Class Period at artificially high prices and were damaged thereby.

58.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Omega was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Omega securities,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

61.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.    Individual Defendants acted as controlling persons of Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Omega and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:   November 17, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, Steve Klein, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Omega Healthcare Investors, Inc. ("Omega" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Omega securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Omega securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in Omega securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have sought to serve as a representative party and/or filed a complaint on behalf of a class under the federal securities laws in the following actions:

- *Klein v. Egalet Corporation et al*, 2:17-cv-0617 (E.D.Pa.);

- *Klein v. StoneMor Partners L.P*., 2:16-cv-06275 (E.D.Pa.);

- *Masillionis v. Silver Wheaton Corp. et al*., 2:15-cv-05146 (C.D. Cal.); and

- *Klein v. Wells Fargo & Company et al*., 3:16-cv-05513 (N.D. Cal.).

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed**  <u>11/17/2017</u>
                     **(Date)**


_____
                     **(Signature)**


         Steve Klein
_____
                 **(Type or Print Name)**

**OMEGA HEALTHCARE INVESTORS, INC. (OHI)**                              **Klein, Steve**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 2/9/2017 | Purchase | 100 | $31.0200 |
| 4/20/2017 | Purchase | 100 | $34.8700 |
| 6/6/2017 | Purchase | 100 | $31.2400 |
| 7/10/2017 | Purchase | 100 | $32.3600 |
| 10/17/2017 | Purchase | 100 | $31.5700 |